**CINCINNATI (CITY) ET, Plaintiffs-Appellees, v CINCINNATI, NEW ORLEANS & TEX. PAC. RY. CO., Defendant-Appellant.**

Ohio Appeals, First District, Hamilton County.

No. 6775. Decided July 11th, 1947.

John D. Ellis, Cincinnati, Ed. F. Alexander, Cincinnati, and Henry M. Bruestle, Cincinnati, for plaintiffs-appellees.

Frost & Jacobs, Cincinnati, for defendant-appellant.

**OPINION**

By ROSS, J.

This is an appeal on questions of law from a judgment of the Common Pleas Court of Hamilton County in favor of the plaintiffs.

The trial·court entered judgment in favor of the plaintiffs-appellees, the parties having in open court waived a trial by jury. The judgment of the court in favor of the plaintiffs-appellees was for the sum of One Hundred Ninety-Four Thousand, Seven Hundred Ninety-three and 95/100 Dollars ($194,-793.95), with interest at six per cent (6%) per annum on One Hundred Sixty-six Thousand Four Hundred Seventy-four and 68/100 Dollars ($166,474.68) from April 1, 1942; interest at six per cent (6%) per annum on Two Hundred Thirty-one and 00/100 Dollars ($231.00) from October 1, 1942; and interest at six per cent (6%) per annum on Twenty-eight Thousand Eighty-eight and 27/100 Dollars ($28,088.27) from April 1, 1943, together with costs to the plaintiffs-appellees.

## PLEADINGS.

In their petition, plaintiffs-appellees set forth that the City of Cincinnati is a municipal corporation under the laws of Ohio; and that the individual plaintiffs-appellees are the duly appointed and acting members of the Board of Trustees of the Cincinnati Southern Railway, a municipally owned railroad constructed under authority of the laws of Ohio; and that the defendant is a private corporation under the laws of Ohio engaged in the operation of a railroad, with lines running into and through the City of Cincinnati, State of Ohio, and other states of the United States, carrying passengers and freight for hire as a common carrier;

That on October 11, 1881, the Trustees of the Cincinnati Southern Railway executed an agreement with defendant, whereby they leased to the defendant the entire line of railway known as the Cincinnati Southern Railway, extending from its terminus in Cincinnati to its terminus in Chattanooga, Tennessee, for a period of twenty-five (25) years; that said lease is fully set out on pages 3 to 18, inclusive, of the Exhibit containing all the agreements between the parties herein, attached thereto and made a part of said petition as though fully incorporated therein. The petition then recites that Clause 2 (p.4) provides the rentals to be paid under said lease, and Clause 3 (p.5) provides for the payment of all taxes, assessments, duties, imposts, and charges whatsoever which may be levied, assessed, or imposed during the lease term by the defendant.

The petition then recites that on June 7, 1902, the parties modified said agreement, providing, among other matters, for an extension of the term of the lease for sixty years, expiring on October 12, 1966, and that said contract of modification and extension of the lease is fully set out on pages 41 and 42 of the Exhibit attached thereto.

Petition further sets forth that on August 1, 1928, the parties executed a second modification and extension of the lease under which they are now operating. Said agreement is fully set forth on pages 179 to 193, inclusive, of the Exhibit attached to the petition. Said modification extends the said lease to December 31, 2026, A. D.

The petition then sets forth the rentals required to be paid under the second modification and extension agreement, and sets forth that in addition to said rental, defendant is required to pay all sinking fund and interest charges on the Terminal Facility bonds as provided in the various Terminal

Facility agreements; the expenses of Trustees of the Cincinnati Southern Railway organization; and all taxes, assessments, duties, imposts, and charges as provided for in said lease and the modifications and extensions thereof.

The plaintiffs then allege that under said agreements there was due them from the defendant in the calendar year of 1942 the sum of One Million Seven Hundred Fifty-two Thousand Five Hundred Sixty-five and 30/100 Dollars ($1,752,565.30) exclusive of the expenses of the Board of Trustees of the Cincinnati Southern Railway, but that the defendant paid them the sum of One Million Five Hundred Eighty-five Thousand, Eight Hundred Fifty-nine and 62/100 Dollars ($1,585,859.62), or One Hundred Sixty-six Thousand Seven Hundred and five and 68/100 Dollars ($166,705.68) less than the amount payable.

Plaintiffs further say that there was due them from the defendant, exclusive of said Trustees' expenses, in the calendar year of 1943, the sum of One Million Seven Hundred Nine Thousand, Six Hundred Eleven and 05/100 Dollars ($1,709,-611.05), but that the defendant paid them only the sum of One Million Six Hundred Eighty-one Thousand Five Hundred Twenty-two and 78/100 Dollars ($1,681,522.78), or Twenty-eight Thousand Eighty-eight and 27/100 ($28,088.27) less than the total amount payable.

Plaintiffs then alleged that demand was made upon the Defendant for payment of the sum of One Hundred Ninety-four Thousand Seven Hundred Ninety-three and 95/100 Dollars ($194,793.95), but that such payment was declined.

Plaintiffs then prayed judgment against defendant for said sum of One Hundred Ninety-four Thousand Seven Hundred Ninety-three and 95/100 Dollars ($194,793.95) together with interest thereon on One Hundred Sixty-six Thousand Four Hundred Seventy-four and 68/100 Dollars ($166,474.68) from April 1, 1942; interest on Two Hundred Thirty-one and 00/100 Dollars ($231.00) from October 1, 1942; and interest on Twenty-eight Thousand Eighty-eight and 27/100 Dollars ($28,088.27) from April 1, 1943, and for such other relief in law or equity to which they may be entitled and for their costs expended.

In its answer, the defendant-appellant admitted the corporate entity of the City of Cincinnati; admitted that the individual plaintiffs-appellees are the duly appointed and acting members of the Board of Trustees of the Cincinnati Southern Railway, a municipally owned railroad, constructed under authority of the laws of Ohio; admitted that defendant is a private corporation under the laws of Ohio, engaged in the operation of a railroad as set forth in the petition.

Defendant further admitted that the lease set forth in the plaintiffs' petition was entered into by Defendant with the plaintiffs, and that the lease agreement is as set forth in plaintiffs' petition.

Defendant further admitted the modification and extension of said lease of June 7, 1902, and the second modification and extension of August 1, 1928, set out on pages 179 to 193, inclusive, of the Exhibit attached to the plaintiffs' petition, and that they are operating under the said second modification and extension of said lease. Defendant admitted that said second modification extends the said lease to December 31, 2026 A. D.

The defendant admitted said second modification extension agreement provides for the payment of the rentals set forth in the plaintiffs' petition, and that in addition to said rentals the defendant is required to pay the sinking fund interest charges on Terminal Facility bonds and the expenses of the Trustees of the Cincinnati Southern Railway organization to the extent of Twelve Thousand and 00/100 Dollars ($12,000.00) per annum.

The defendant admitted that the Trustees of the Cincinnati Southern Railway made demand upon it for the payment of the sum of One Hundred Ninety-four Thousand Seven Hundred Ninety-three and 95/100 Dollars ($194,793.95), and that such payment has not been made by it; and the defendant then denied each and every other allegation contained in the plaintiffs' petition which was not specifically admitted to be true.

By way of further answer, the defendant then set forth that on or about April 30, 1940, there was instituted in Franklin Circuit Court, in the Commonwealth of Kentucky, Case No. 38018, which was an action by the Commonwealth of Kentucky on relation of H. Clyde Reeves, Commissioner of Revenue, against the City of Cincinnati, Ohio, a municipal corporation, and The Cincinnati, New Orleans and Texas Pacific Railway Company.

The said action had for its purpose the collection from the City of Cincinnati (The Cincinnati, New Orleans and Texas Pacific Railway Company being a garnishee only) of large sums of money said to be owed by it to the Commonwealth of Kentucky as income taxes for the years 1936, 1937, 1938 and 1939, together with interest and penalties provided by the statutes of Kentucky for failure to file returns and seasonably pay said income taxes. The income tax claimed

6

due from the City of Cincinnati was based upon that part of rentals (less such deductions as the taxpayer might claim under the statute) paid the Trustees of the Cincinnati Southern Railway by The Cincinnati, New Orleans and Texas Pacific Railway Company pursuant to the aforementioned lease for the years involved. alleged to be allocable to Kentucky sources. The main defendant (the City of Cincinnati) in said action by answer denied any liability whatsoever for income taxes to the Commonwealth of Kentucky.

The answer then set forth that upon hearing, said Franklin Circuit Court rendered judgment for the Commonwealth of Kentucky in said action, in the amount of One Hundred Sixty-six Thousand Four Hundred Seventy-four and 68/100 Dollars ($166,474.68) and costs, which amount the defendant, as garnishee, paid to said Court on or about April 6, 1942, pursuant to a resolution passed by the Trustees of the Cincinnati Southern Railway on March 30, 1942, and then set forth the last paragraph of said resolution, the effect of which was to authorize The Cincinnati, New Orleans and Texas Pacific Railway Company to deduct such amount of money as it as garnishee may be ordered to pay into court from the quarterly rental under the lease for said railroad, with the understanding and upon the condition that the Trustees do not relinquish and specifically reserve all of their rights under said lease to claim and demand from said defendant railway company the payment of the full amount of said judgment, including interest and penalties in addition to the rentals provided for in the lease between said Trustees and said railway company.

The answer then set forth the amounts that it as garnishee was ordered to pay to the Clerk of the Court, which consisted of the income taxes adjudged due the State of Kentucky for the years 1936 to 1939, inclusive, interest on said taxes, and then three separate penalties on said taxes as provided by the statutes of Kentucky, said amounts totaling One Hundred Sixty-six Thousand Four Hundred Seventy-four and 68/100 Dollars ($166,474.68).

The answer then set forth that pursuant to said resolution and the judgment of said Court, the defendant deducted the amount of One Hundred Sixty-six Thousand, Four Hundred Seventy-four and 68/100 Dollars ($168,474.68) from the next quarterly rental payment due from defendant to plaintiffs.

Defendant then set forth in its answer that pursuant to an agreement made between the plaintiffs-trustees and the defendant, the latter, on August 14, 1942, paid the costs, aggregating Two Hundred Thirty-one and 00/100 Dollars

($231.00) incurred in the action in the Franklin Circuit Court, and deducted said amount from the next quarterly rental payment due to plaintiffs by defendant.

The answer then set forth that the City of Cincinnati prosecuted an appeal to the Court of Appeals of Kentucky, which is the court of last resort in the Commonwealth of Kentucky, and that Court, by opinion of December 11, 1942 (rehearing denied February 12, 1943) affirmed the judgment of the Franklin Circuit Court, which case is reported in 292 Ky. 597, 167 S. W. (2d) 709.

The answer then set forth that on or about June 1, 1941, there was instituted in Franklin Circuit Court, Kentucky, as Case No. 38580 a similar action brought against the City of Cincinnati and The Cincinnati, New Orleans and Texas Pacific Railway Company, as garnishee, for the recovery of income tax, interest and penalties with respect to the year 1940, and that the parties agreed to hold that litigation in abeyance until the final adjudication of the earlier case by which they agreed to be bound.

Accordingly, after the decision of the Court of Appeals in Case No. 38018, a consent judgment was entered in case No. 38580 in satisfaction of which The Cincinnati, New Orleans and Texas Pacific Railway Company, as garnishee, paid to the Clerk of said Court on or about March 12, 1943, the sum of Twenty-eight Thousand Eighty-eight and 27/100 Dollars ($28,088.27).

The answer then set forth that such payment was authorized by the Trustees of the Cincinnati Southern Railway by resolution similar to that herein above referred to, and that pursuant thereto said payment was made to the Clerk of the Franklin Circuit Court of Kentucky. Defendant then set forth in its answer the amount of the tax, interest and the three separate penalties paid, which made up the total amount of Twenty-eight Thousand Eighty-eight and 27/100 Dollars ($28,-088.27).

The defendant then averred that in paying the next installment of rental it deducted said sum of Twenty-eight Thousand Eighty-eight and 27/100 Dollars ($28,088.27).

The defendant then averred that at no time prior to the filing of the aforementioned actions by the Commonwealth of Kentucky was it advised by the Trustees of the Cincinnati Southern Railway, the City of Cincinnati, or anyone else that the Commonwealth of Kentucky claimed that a tax was due on the rent received by the Trustees of the Cincinnati Southern Railway or the City of Cincinnati, nor was any return filed

by the Trustees of the Cincinnati Southern Railway or by the City of Cincinnati with the Commissioner of Revenue of Kentucky as required by the laws of Kentucky, showing that there was any income tax due the Commonwealth of Kentucky by the Trustees of the Cincinnati Southern Railway or the City of Cincinnati.

The defendant further averred that at no time prior to the adjudication of the liability of the City of Cincinnati for income taxes due the Commonwealth of Kentucky was any demand made upon it by the Trustees of the Cincinnati Southern Railway or the City of Cincinnati for the payment of said taxes.

The defendant further averred that the Trustees of the Cincinnati Southern Railway, its Lessor, at no time requested it to file on their behalf an income tax return to Kentucky for any of the years 1936 to 1940, inclusive, and further averred that it had no information or data necessary for the filing of such returns.

The defendant then averred that Clause 3 of the contract of lease made the eleventh (11th) day of October, 1881, and copied verbatim as Section 8 of the second modification thereof under date of August 1, 1928, found on pages 4 and 188, respectively, of the Exhibit attached to the plaintiffs' petition, did not and do not contemplate or require the defendant to pay or bear taxes or penalties or interest thereon levied or assessed against the Lessor or the City of Cincinnati on the income derived by them, or either of them, as rental from the defendant, and further alleges that the defendant is not liable for the taxes or the penalties or the interest which it deducted from the rentals as set forth in its answer.

The defendant further averred that there is no other provision or covenant in said lease contract or the modifications thereof which requires the defendant to pay or bear any taxes, penalties or interest levied or assessed against the plaintiffs based upon the rentals derived by the Lessor, the Trustees of the Cincinnati Southern Railway, from the defendant.

The defendant then averred that it was, therefore, justified and entitled in law and in equity to deduct from the rentals due the Trustees of the Cincinnati Southern Railway the amounts which it was required, as garnishee, to pay to the Clerk of the Franklin Circuit Court of Kentucky, as taxes, as interest, as penalties and as costs.

The defendant then set forth in its answer that it had theretofore been agreed between the said trustees, the City of Cincinnati and The Cincinnati, New Orleans and Texas

Pacific Railway Company that as between themselves, for the purpose of defending the cases filed in the State of Kentucky and making agreements with respect to matters growing out of them and settling any dispute as to the party ultimately liable under the lease of the Cincinnati Southern Railway for any income taxes, penalties and interest thereon, the City of Cincinnati would be regarded as having fully represented the said Trustees of the Cincinnati Southern Railway.

The defendant then prayed that having fully answered, the petition of the plaintiffs be dismissed, and that the defendant be allowed to go hence without day and recover its costs expended.

To this answer the plaintiffs filed a reply, in which they admitted the institution of the causes of action in the State of Kentucky as set forth in the defendant's answer, and admitted the passage of the resolutions by the Trustees of the Cincinnati Southern Railway, as set forth in defendant's answer, and admitted the payment of the judgments by the defendant, as garnishee, and denied each and every other allegation in the defendant's answer not specifically admitted in its reply or petition to be true.

## FACTS.

It appears from the admissions in the pleadings, the stipulation of the parties and the evidence that the City of Cincinnati is the owner of the Cincinnati Southern Railway, a railroad extending from Cincinnati, Ohio, through Kentucky, to Chattanooga, Tennessee.

That in 1881, such railroad and all its appurtenances and facilities were leased to The Cincinnati, New Orleans and Texas Pacific Railway Company, for a term of twenty-five (25) years; that in 1902, a contract was entered into between lessor and lessee extending the term of the lease and adopting with some modifications the terms of the original lease; that in 1928, the terms of the lease were again extended and a rental clause, as hereinafter set forth, adopted by the parties.

The lease and the extensions were cumulative in that the modification of 1902 contained in effect all unmodified provisions of the original lease of 1881 and the extension of 1928 preserved the unmodified conditions of both the draft of 1881 and 1902. One unmodified clause so preserved in tact throughout the extensions was clause 3 of the lease of 1881, which

became clause 8 of the extension of 1928. The extension of 1928 contained the following clauses including such unmodified clause 8:

### THE LEASE. (1928)

"Now this indenture made between the said Trustees of the Cincinnati Southern Railway, party of the first part, herein called the Trustees, and The Cincinnati, New Orleans and Texas Pacific Railway Company, party of the second part, hereinafter called the Company, with the approval of the Trustees of the Sinking Fund of said City, pursuant to the provisions and under the authority of the Act of the General Assembly of Ohio, of April 23, 1898, aforesaid, Witnesseth, and it is mutually covenanted and agreed by said parties, each for itself, its successors and assigns, as follows:

"Section 1. That for and in consideration of the increase of the present current rental of the existing lease and the payment of the further fixed and contingent rentals as provided herein, the Trustees of the Cincinnati Southern Railway, lessors aforesaid, agree to the modification of the rental of the existing lease and grant to The Cincinnati, New Orleans and Texas Pacific Railway Company, lessee aforesaid, the extension of the term of the lease petitioned for, to-wit: for the full term of sixty years and eighty days from the date of the expiration of the present term; that is to say, until and including the 31st day of December, A. D. 2026. Said party of the second part to have and to hold the demised premises' and all additions and improvements thereon for the term above stated upon the terms and conditions stipulated in said lease, in the first modification and extension thereof, and in this Indenture further modifying and extending the same.

"Section II. Rental according to the terms of the first modified and extended lease of June 7, 1902, to be paid in cash up to and including December 31, 1927. The rental subsequent to December 31, 1927, coming due under the terms of the extended lease of June 7, 1902, shall be modified, fixed and determined as provided in this Indenture, which modified rental and the further rentals provided and payable herein, the party of the second part covenants and agrees for itself, its successors and assigns to pay to the party of the first part, its successors and assigns, in lawful money of the United States of America at the Treasury of the City of Cincinnati, Ohio, and the same are fixed and determined as follows, to-wit:

"First: For the period from January 1, 1928, to December

31, 1946, a fixed annual rental of One Million, Two Hundred Fifty Thousand ($1,250,000.00) Dollars, plus the expenses of the Trustees' organization, as provided in the present lease, payable in quarterly installments on April 1, 1928, for the prior quarter, and thereafter on the first days of July, October, January and April in each year during said period, and in addition thereto a contingent annual rental equivalent to two (2) per cent. of the net profits derived by the lessee from the operation of the leased property during such period, ascertained and payable as hereinafter set forth.

"Second: For the period from January 1, 1947, to December 31, 1966, a fixed annual rental of One Million, Three Hundred Fifty Thousand ($1,350,000.00) Dollars, plus the expenses of Trustees' organization, as aforesaid, payable in quarterly installments on the said quarterly due dates of each and every year during said period, and in addition thereto a contingent annual rental equivalent to three (3) per cent. of the net profits derived by the lessee from the operation, of the leased property during such period, ascertained and payable as hereinafter set forth.

"Third: For the period from January 1, 1967, to December 31, 1986, a fixed annual rental of One Million, Four Hundred Fifty Thousand ($1,450,000.00) Dollars, plus the expenses. of Trustees' organization, as aforesaid, payable in quarterly installments on the said quarterly due dates of each and every year during said period, and in addition thereto a contingent annual rental equivalent to four (4) per cent. of the net profits derived by the lessee from the operation of the leased property during such period, ascertained and payable as hereinafter set forth.

"Fourth: For the period from January 1, 1987, to December 31, 2006, a fixed annual rental of One Million, Six. Hundred Thousand ($1,600,000.00) Dollars, plus the expenses of Trustees' organization, as aforesaid, payable in quarterly installments on the said quarterly due dates of each and every year during said period, and in addition thereto, a contingent annual rental equivalent to five (5) per cent. of the net profits derived by the lessee from the operation of the leased property during such period, ascertained and payable as hereinafter set forth.

"Fifth: For the period from January 1, 2007, to December 31, 2026, a fixed annual rental of One Million, Seven Hundred Thousand ($1,700,000.00) Dollars, plus the expenses of Trustees' organization, as aforesaid, payable in quarterly installments on the said quarterly due dates of each and every year

during said period, and in addition thereto a contingent annual rental equivalent to six (6) per cent. of the net profits derived by the lessee from the operation of the leased property during such period, ascertained and payable as hereinafter set forth.

"The contingent rental, ascertained in the manner hereinafter provided, shall be payable annually on July 1, of the year succeeding the year in which it has been earned.

"The obligation to make the interest and Sinking Fund payments upon the City Bonds heretofore issued for terminal improvements and betterments as provided in the present lease and supplemental contracts shall continue pursuant to said lease and contracts.

"Section III.    That this contract of modification and extension is and is so treated and considered by the parties hereto, as the second modification and extension of the original lease of 1881, and that as such, all terms, conditions, covenants, stipulations, obligations, and agreements therein contained, and in the contract of the first modification and extension agreement of date June 7, 1902, not heretofore by their terms executed and completed, are to remain in full force and effect during the remainder of the term of the said first modification and extension granted thereof and during the modification and extension thereof hereby granted, except so far as the same are modified or amended by this Indenture, and all such terms and conditions are hereby affirmed and confirmed by the parties hereto as though restated and rewritten herein, and the party of the second part for itself, its successors and assigns, hereby covenants and agrees with the said party of the first part, its successors and assigns that it will observe, keep and perform all the covenants, stipulations, and agreements of said original lease, and of said first modification and extension thereof and of this Identure, and will not evade or violate any of the same; both parties hereto, moreover, hereby ratifying, confirming and approving all other supplementary and supplemental agreements and deeds, heretofore made between them, or by either of them to the other.

"Section IV.  The Lessee Company agrees, upon the execution of this agreement of modification and extension, and in consideration thereof, to proceed at its own cost and expense, to construct upon the line of Railway and upon the right of way now owned or hereafter acquired by or for the Trustees of the Railway, a second main or double track from Williamstown, Kentucky, to Danville, Kentucky.

"Section V. It is agreed by the parties hereto that the term 'net profits' as used in ascertaining the amount of the contingent rental herein provided to be paid shall be interpreted to mean the difference between the 'net railway operating income' of the leased property in any one year (ascertained under accounting regulations of the Interstate Commerce Commission) and the fixed rental (including interest and Sinking Fund accruals) due in such year under the terms of this lease contract, and it is further stipulated that the provision for contingent rental shall not be interpreted as giving the lessor or its representatives any further voice in operating management or administration of the leased property beyond that heretofore exercised under the terms of the existing lease.

"Section VI. That at the execution and delivery of this Identure, the said party of the second part shall execute, acknowledge, and deliver to the Trustees of the Cincinnati Southern Railway, a deed confirming the mortgage executed and acknowledged on the 11th day of October, 1881, given by The Cincinnati, New Orleans and Texac Pacific Railway Company to said Trustees and extending the lien thereof to all property thereby covered or to be hereafter acquired as security for the performance of the covenants of said lease and of the first modification and extension agreement of June 7, 1902, and of this Indenture and of any supplemental agreements made regarding terminal facilities or permanent betterments.

"Section VII. This contract of modification and extension of said lease, is made subject to the extension of the franchise rights of the Trustees under the laws of the States of Kentucky and Tennessee, in the securing of which by the Lessor, the Lessee covenants and agrees to co-operate to the fullest extent, provided, that if the said extension of the said franchise rights is not secured, neither Lessor nor Lessee shall have any claim against the other for failure thereof; and provided further, that all payments of rental, fixed and contingent, made or to be made hereunder by the Lessee prior to the expiration of the present franchise rights of the Trustees, shall remain the property of the Lessor and the Lessee shall have no right or make any claim to recoup or recover any of said payments from said Lessor. Provided further, that the application for such extension shall be made by the Lessor at such time as will be acceptable to the Lessee, but the same shall not be later than January 1, 1962.

"Section VIII. And the said party of the second part further covenants and agrees to pay and discharge, as often as they shall become due, any and all taxes, assessments, duties,

imposts and charges whatsoever which may be levied, assessed or imposed during the term hereby granted, by any government or lawful authority whatsoever upon the premises hereby leased, or any part thereof, or upon any business or earnings, or income of the same, or by reason of the ownership thereof, it being the true intent and meaning hereof that all governmental charges upon the aforesaid property or income therefrom, which may be imposed by any governmental authority capable of enforcing such charges, through, upon or against said property, or the corporation owning or the party leasing the same, shall be assumed and satisfied by the party of the second part hereto, however the forms thereof may change during the term hereby granted."

## THE LEASE.  (1881)

In Clause 6 of the original lease of 1881 appears the following terms:

"Clause 6.  And the said party of the second part further covenants and agrees with the party of the first part, that the said party of the second part will provide and keep the said line of railway supplied with rolling stock and equipment so that the business of the same shall be preserved, encouraged and developed, and that the same shall at all times be done with safety and expedition, and the public accommodated in respect thereto with all practicable conveniences and facilities, and that all future growth of such business, as the same may arise or be reasonably anticipated, shall be fully provided for and secured, and that all reasonable efforts shall be used to maintain, develop and increase the business of said line of railway, and further that it will pay and save harmless the party of the first part from the payment of **any costs, expenses, claim, liabilities, damages and demands whatsoever arising out of the possession, control, management and operation of said line of railway and its appendages, or any part thereof, the said party of the second part taking upon itself the same duties, liabilities and obligations in respect thereto as if it had become the owner thereof, and doing every act and thing that may by law be required of, or be obligatory upon the lessee or said party of the first part, its successors or assigns.**"  (Emphasis added.)

It is not claimed that this latter clause has any direct bearing upon the matter of income tax, but it does indicate

the intention of the parties to free the Lessor from any charge against the net return on the operation of the railway.

## THE KENTUCKY TAX.

In 1936, the State of Kentucky passed "An Act relating to revenue and taxation, providing for an income tax, the collection and administration thereof."

Both of the parties to the lease agreement ignored the provisions of this Act as inapplicable to the **Lessor.**

In 1940 a suit was filed by the Commissioner of Revenue of the State of Kentucky against the City of Cincinnati, seeking payment of income taxes and penalties, alleged to be due the State of Kentucky by reason of income received by the City of Cincinnati as rentals from the lessee railway for the years 1936, 1937, 1938, and 1939. A later similar action was filed for the tax upon the rentals of the year 1940.

These actions were litigated through the several Kentucky courts resulting in final judgment against the City. The validity of the conclusion of the highest court of Kentucky upon the right of that state to tax a political subdivision of a sister state, especially in view of the position of the Federal Government as to income tax from such political subdivision to it, is not presented in this appeal. The decision of the Court of Appeals of Kentucky is reported in 292 Ky. 597. Rentals due in the possession of the lessee were attached, subsequently paid to the State of Kentucky and deducted by lessee in its rental accounting with the lessor.

The parties had agreed to try only the first suit filed for the taxes alleged to be due for the years 1936 to 1939, inclusive, and upon the final decision of that case a judgment was entered in the second case (involving taxes for the year 1940) for Twenty-eight Thousand Eighty-eight and 27/100 Dollars ($28,088.27), which was paid by The Cincinnati, New Orleans and Texas Pacific Railway Company, as garnishee, on March 12, 1943, under a resolution adopted by the plaintiffs-trustees, and which resolution is set forth in the stipulation.

Under the arrangement set forth in the Stipulation of Facts filed herein, these judgments and costs were paid by the Railway Company, as garnishee, in the total sum of One Hundred Ninety-four Thousand Seven Hundred Ninety-three and 95/100 ($194,793.95) Dollars, without prejudice to the rights of either party.

The sum was deducted by The Cincinnati, New Orleans and Texas Pacific Railway Company from rentals due under

16

the lease, and the City of Cincinnati and the Trustees of the Cincinnati Southern Railway then filed an action in the Common Pleas Court of Hamilton County, Ohio, for the amounts so deducted from said rentals.

## THE ISSUE.

The question thus presented to the trial court and this court upon appeal is whether under the lease and several extensions the lessee railway is required to pay the tax levied by the State of Kentucky upon the net rental income passing from the lessee railway to the lessor.

The answer to this question seems so clear that were it not for the conscientious effort and able treatment of the problem employed by all counsel involved, it would seem sufficient to state in concise language the conclusion thereon which is, that the lessee is clearly bound to pay the tax upon the income of the City Lessor from the railway lessee. That such was the manifest intention of the parties to the lease as expressed in the original draft and extensions seems clear beyond any possible doubt. This conclusion is reached not only from a reading of clause 8, but from a careful scrutiny of the several agreements of 1881, 1902, and 1928, and the factual environment of the parties.

It is difficult to imagine what language could have been used by the parties to definitely express a determination that the income of the City Lessor, through the Trustees, from the Railway Lessee should be absolutely **net**, to the City of Cincinnati. Every possible type of charge or claim against such income was required to be discharged by the lessee.

The contentions of counsel for the Lessee Railway will, however, be considered in detail for the reasons hereinbefore stated.

## THE DEFENDANT'S CONTENTIONS.

(1) It is contended that the lease must be construed most strongly against the lessee. 32 Am. Jur. 133, cited in support of this contention is more an authority for the proposition that where the lessor has prepared the lease the rule prevails. Presuming such to be the case, the contention may be accepted.

(2) It is contended that in the absence of express agreement on the part of the tenant to pay taxes, they must be borne by lessor. Certainly, as far as taxes upon the income

to the lessor paid by lessee as rental, such rule would apply.

(3)   It is contended lessee is only bound to pay such taxes as it has expressly agreed to pay.

No objection to this contention may be made as far as it involves the instant facts.

(4)   It is contended that a general covenant to pay taxes will not be extended beyond its natural or ordinary meaning. This in effect merely means that the parties are bound by the terms of their agreement.

(5)   It is contended that it is incumbent upon the landlord, if he would relieve himself of taxes, so to provide in the lease and contract.

This but repeats the former contentions.

As its conclusion upon these premises, the defendant contends that "a lessee may expressly covenant for or against the payment of any income tax assessed against or exacted from the lessor by virtue of the rent reserved in the lease" but this lease has not so expressly provided.

It cannot be admitted, however, that the language hereinbefore set forth, quoted from the several agreements between the parties, can be classified as "a general covenant to pay taxes against demised premises."

On the contrary, the tax covenants and agreements to be performed by the lessee are specific and detailed in the extreme.   There can be no objection to the contention of defendant that "whether or not an agreement by a lessee to pay the lessee's (lessor's?) taxes includes income taxes depends upon the words of the contract, the context in which they occur, and the subject-matter to which they are applied."

The defendant states:

"In endeavoring to arrive at the intention of the parties as expressed in their contract, we must take into consideration that the lease in question was entered into on the 11th day of October, 1881.   At that time there were, so far as Defendant-Appellant knows, no income tax laws in effect," and continuing—

"It is true that during the war of 1812 an attempt was made to adopt an income tax law in the United States.   The first income tax law enacted by the United States was the Act of August 5, 1861, which taxes incomes between $800 and $5,000 at the rate of 3%, incomes not over $10,000 at the rate of 7½%, and incomes in excess of $10,000 at the rate of 10%. This law remained in effect, with several amendments, until December 31, 1871.   See 1947 Prentice-Hall Federal Tax Serv-

ice, Vol. 4, page 50,003, History of Income Tax." The defendant continues—

"We find then that at the time of the entering into of the lease in question, there was no Federal income tax law in effect; and in so far as Defendant-Appellant has been able to ascertain from diligent search, there was no income tax law in effect in the States of Ohio, Kentucky or Tennessee. It would appear clear, therefore, that the parties did not have in mind that the lessee should pay any income tax under the then presently existing laws."

## EARLY HISTORY OF STATE AND FEDERAL TAX ON INCOME.

Taxes upon income were known in Greece as far back as 428, B. C. In Rome about the year 175, B. C. a special income tax was imposed in anticipation of war. A continuation of the tax over a long period so increased the treasury that later an order was made returning such tax to the payers covering previous payments of 25 years.

The ancient origin of taxes upon income is commented upon in State, ex rel. Bolens v Frear, 148 Wisc., 456. Taxes on income were known in Italian cities in the fifteenth century, in France in 1697, in England in 1799, in Prussia in 1812.

State tax upon income was known in Massachusetts in 1634, in Rhode Island in 1673, in New Jersey in 1684, in Virginia in 1786, in Pennsylvania in 1844. Other States passing income tax laws were Georgia, Louisiana, North Carolina, Alabama, and in 1913 State income tax laws were in force in Wisconsin, Virginia, North Carolina, South Carolina, and Oklahoma. See, Income Tax Law, Analysis and History, Harris Forbes & Co. (1913); State Tax Commissions in the United States (1897), James W. Chapman, Cincinnati Law Library Pamphlets 53. Also, State Income Taxes, National Industrial Conference Board, 1930.

In 1869 Durbin Ward was making an impassioned plea to Commissioner Delano to exclude the "Shakers" from the operation of the Federal Income Tax. (See, Cincinnati Law Library, Pamphlets, 80).

In 1871, the Hon. John Sherman, of Ohio, was speaking before the United States Senate against modification of the then existing Income Tax Law, (See, Cincinnati Law Library Pamphlets, 235) and in 1866 the Justices of the Supreme Court of New Hampshire wrote their opinion upon the constitutionality of an income tax law to the Governor of that State.

## INTENTION OF THE PARTIES.

Can it be seriously claimed that merely because no applicable income tax law in 1881 directly then affected the revenue of the City of Cincinnati from the lease that the possibility or even imminence of application of a tax on such revenue ·was not fully considered by the parties?   It can reasonably be inferred that the City of Cincinnati knew through the Trustees that one or more of the States through which the Railway extended might at any time consider it necessary to replenish their depleted treasuries by recourse to such an expedient as other states had done.  It may also be reasonably inferred that although the Federal situation just at that time was satisfactory, it might change to the disadvantage of the City Lessor.  That possibility is not wholly beyond the scope of imagination now.   Certainly, state public employes considered themselves for many years beyond the pale of Federal income tax payments, only to be rudely shocked by a decision against them **from which there is no appeal.**

It is to be remembered also that this agreement was fully considered in 1928, when income tax was certainly a matter of concern to men upon the street.

In 1881, in 1902, and 1928, State and Federal income taxes were more than speculative menaces to the income of the City. It would be unreasonable to suppose that the City provided against every other form of attack upon its income and overlooked this, even if the language used did not negative such a consideration.

It is true that the covenant against taxes, charges, and assessments, and other provisions securing an absolute net return to the Trustees, are expressed in all-inclusive terms. The reason for the employment of such general terms rather than a resort to detailed specification of particular taxes, charges, and assessments is evident when the effect of the maxim "expressio unius est exclusio alterius" is considered. It was the evident intent of the lessor, acquiesced in by the lessee, to include every form of tax, charge, and assessment then known or conceivable.   Had specific. detailed types of such taxes, charges, or assessments been mentioned in such covenant and other provisions, it can easily be imagined that some form of tax, charge, or assessment then (in 1881, 1902, or 1928) unknown, might later intervene and the employment of the maxim would result in the exclusion of the protection of the covenants and provisions.

The defendant notes that the enactment of the 16th

Amendment caused no change in the terms of the covenant, in the extension of 1928, and argues that it was, therefore, not the intention of the parties to apply the terms of the covenant to income taxes.

The defendant, however, overlooks the later history of the Federal Income Tax Law.

## LATER HISTORY, FEDERAL LAW, TAX ON INCOME.

The second period of income tax operation was in 1894, being a part of the Wilson Tariff Law of that year. The new law was largely modelled after the Law of 1861 and provided a tax of 2% on all private incomes in excess of $4,000, and also upon the incomes of corporations, companies and business associations not including partnerships. There was no differentiation between incomes, and there was no attempt to collect the tax on the income at its source. The Law of 1894 had no sooner gone into effect than the fight on its constitutionality began to be waged. The test case was that of Pollock v The Farmers' Loan & Trust Company, 157 U. S. 429, 158 U. S. 601, which, after a second trial, was declared by a divided court to be unconstitutional. At the first trial, certain very important phases of the question were decided against the act, but because by a division of four to four they were unable to determine the constitutionality of the balance of the statute, the entire subject had to be reopened and argued for the second time, with the result as stated above. The basis of the successful attack against the law was Section 3, Article I' of the Federal Constitution, providing that direct taxes shall be apportioned among the several States.

The Pollock case had hardly been finally decided before steps were taken resulting in the 16th Amendment, which became law in 1913. From that date to the present time there is no indication that income tax was assessed against plaintiff.

The operation of the Federal Income Tax Law presented no occasion for modifying the terms of the covenant in the draft of 1881. But there was another reason why the parties, and especially the lessor, felt no fear that the tax covenant and other provisions of the lease and extensions did not secure them a net revenue.

The covenant in the original lease had been tested by the imposition of a franchise tax by the State of Kentucky, and in 1899 the United States Circuit Court in an opinion written

by Judge William Howard Taft held that the covenant required the lessee to pay a franchise tax charged by the State of Kentucky against the lessor City. Thomas v The Cincinnanti, New Orleans & Texas Pacific Railway Co., 93 Fed. 587.

If the covenant was held good by the courts against a franchise tax, **which tax was not specifically mentioned in the covenant** (although income was) why should the lessor change the terms of the covenant?

The language of Judge Taft (page 591 of the opinion) seems posthumously pertinent:

"It was evidently the purpose to secure to the City of Cincinnati a net rent, without any deduction from taxation arising from its ownership of The Cincinnati Southern Railway. By Clause 3, the lessee agrees to pay all taxes, assessments, duties, imposts, and charges whatsoever which may be imposed during the term, by any governmental or lawful authority, upon the premises leased, or any part thereof, or upon any business or earnings or income of the same or by reason of the ownership thereof. And it is recited to be the true intent of this clause that all governmental charges upon the property or the income, imposed by any governmental authority capable of enforcing them, through, upon or against the property of the corporation owning, or the party leasing, the same, shall be satisfied by the party of the second part, whatever the form in which said charge may be. The tax against the Trustees of the Cincinnati Southern Railway is a tax upon its franchise to construct, own and lease the railway and is therefore a tax imposed 'by reason of the ownership' of the railway, and so is within the words of Clause 3."

The difference between income and franchise taxes is recognized. However, the point really decided by the Thomas case is that the terms used in the covenant are effective to give the lessor an absolute net rental. Had the instant problem been before the Circuit Court, it cannot be conceived that a different result would have followed. It must be considered now that the parties anticipated the imposition of a **franchise tax** and used language to protect the lessor. The Thomas case makes this conclusion res judicata. Can it be supposed that in view of the ever present threat of both Federal and State Income taxes the lessor would not have changed the terms of the covenant, had it not felt secure in the terms then used?

The defendant claims the clause was directed only to an income tax which the lessee might be required to pay. De-

fendant states in its brief: "we must bear in mind that when the lease was entered into in 1881 there was no income tax law, and if the parties contemplated the payment of income taxes at all they could not, of course, at that time tell what the law would provide, and therefore they desired to make certain that the lessee would have to pay all of the taxes assessed by reason of its operation of the railroad property, and this is the conclusion that the Massachusetts Court and the Circuit Court of Appeals for the Second Circuit came to in the cases just above cited." Why should the lessor ignore the same contingency it applied to it?

The defendant calls attention to a reference, in the 1902 extension, to a decision of the United States Circuit Court, holding the lessor was not responsible under the terms of the 1881 lease for rebuilding bridges, but that such duty rested upon the lessee. It is noted that although such reference to a construction of the lease was incorporated in an extension, the 1928 extension carried no reference to the Thomas case. Defendant in its brief states:

"We submit that if the City of Cincinnati and the Trustees of the Cincinnati Southern Railway had considered the construction placed by Judge Taft on the tax covenant found in Clause 3 of the lease of 1881, as broad and all-inclusive as they now contend for, they would have, by reference, in the 1902 modification, embodied it as a part of the lease, or certainly when they rewrote Clause 3 verbatim in the 1928 modification, they would have, in connection therewith, adopted and made part of the lease the construction placed upon the tax covenant by Judge Taft. Their failure to do so, we submit, is strong evidence of the fact that they did not consider the decision of Judge Taft as broad and all-inclusive as Plaintiffs-Appellees would have this court believe. Certainly it was of equal, if not of greater, importance to the City and the Trustees, if it meant what they say it means, than the decision of the Circuit Court of Appeals adopted by reference in the 1902 modification."

With all due deference to this contention, an opposite conclusion seems required. The Trustees may have had some doubt as to the obligation as to bridges, they had no doubt as to the tax covenant. A reference to the Thomas case would have weakened rather than strengthened an opinion of confidence in the all-inclusive terms of the tax covenant. It is apparent that the Trustees considered the Thomas case merely

a vindication of a construction which to them throughout the years had seemed clear and unambiguous, and needed no modification or re-enforcement from judicial interpretation.

The defendant states that the rental which the lessor received from its lessee **"is not income from the property owned by the lessor,"** that "rental is paid by the lessee to the lessor by reason of its contractual obligation to pay rent as set forth in the lease."

Again, with full respect to the sincerity and acumen of counsel, the distinction here asserted is not apparent. Of course, there is a distinction between revenue obtained from real estate based upon the sale of crops, or ore or oil, and revenue which accrues in the shape of money paid for its use. Certainly, however, the real estate in each case is the basis producing the revenue. What other revenue could have been considered by the parties to the lease contracts, but the rental to be paid for the use of the railway facilities, and how can it be claimed that such being the case the parties did not consider such rental as "income of the same"? To what does "the same" refer? Certainly, to "the premises hereby leased" —"or any part thereof." The premises are the source of income, and the parties realized the only "income" from such premises could be only rental, and incidentally, there was no "income" until the rental was received by the lessor.

If more is needed—again, the covenant in effect refers to any income received **"by reason of the ownership thereof,"** that is, ownership of the premises leased.

This now too extended opinion may not be further enlarged by detailed reference to authorities, which defendant claims sustains a differentiation in its favor. It must be sufficient to say that they do not, although they have been examined with care. The authorities in which somewhat similar provisions to those contained in the instruments under consideration were reviewed, have also been examined in detail. Language noted by the defendant appears in some of these indicating an adverse conclusion to that reached herein. It must be considered, however, that no situation is involved identical to that here considered. The general principles announced are acknowledged, but those courts did not have before them the three instruments here considered or the factual environment here presented.

Generally speaking, all authorities favorable to the defendant are predicated upon a requirement of specific covenant, which consideration has been treated hereinbefore.

The inescapable conclusion is, that, considering the entire

history of the relations of the parties as developed by the record, the terms of the lease and its extensions, the menace of laws imposing an income tax, both Federal and State, existing before and during the existence of the contracts involved, and the all-inclusive scope and character of the terms used, it must be found that the lessee is bound to pay the income taxes imposed by the State of Kentucky.

In the concluding pages of the defendant's brief in chief it has considered the several cases holding adversely to a lessor's claim of covenant against taxes and other clauses which have been construed to place upon the lessee the burden of payment. It is argued that the plaintiffs must have been aware of these holdings and have excluded the lessee from responsibility for any income tax, in that the language of the tax covenant was not modified in the 1928 extension.

The opposite conclusion seems rather to be the logical inference. The lessor had before it the conclusion in the Thomas case and the more tenable inference is that the lessor considered the terms, continuously employed since 1881, ample for all purposes, including protection against the payment of a state income tax.

Whether or not there is a difference in application to the provisions of the instrument here considered in the case of Federal and State income tax it may not be important to consider, the fact remains, however, that the tax involved in the issues presented is a tax imposed by the State of Kentucky upon income produced in that state, or at least so held to be.

The defendant presents an alternative to the denial of any liability, in that it claimed it is at least not liable for the penalties assessed against the lessor. If the lessee is liable under the provisions of the instruments considered, as is the conclusion herein reached, then it was always liable for the income tax assessed against the lessor, and the neglect to return and pay such tax was its neglect as well as that of the lessor. If there was any mistake in reference to its responsibility, it was one of law and not of fact.

Both the lessor and lessee cooperated in an effort to defeat the tax. They were agreed in their opinion that the tax was not properly assessable against the lessor. In this, according to the Kentucky courts, they both were in error. That mutual error resulted not only in a requirement that the tax be paid, but also that penalties shall be paid. The burden, therefore, rests upon the lessee to pay such penalties.

One final contention of the defendant requires consideration.

It is its contention that payment of the income tax of the lessor by the lessee would increase such income and result in imposition of successive income taxes ad infinitum. The case of Eastern Mass. St. Ry. Co. v Boston Elevated Railway, 310 Mass. 659, is cited in support of this proposition. Counsel for defendant, however, in their brief in chief cite many cases where, in the opinions of courts, terms have been employed which do require payment of lessor's income tax by lessee. Apparently, the suggested cumulative character of the provisions did not disturb the ultimate conclusion of such latter courts in enforcing what they considered a binding provision on the lessee.

It is also claimed the defendant has no adequate facilities for determining the proper return of the lessor. Reference to the provisions of the lease and extensions indicate that the parties to the lease are required to maintain the closest of business and office contacts.

Certainly, it would be the simplest of matters to ascertain from the lessor what amount was deductible from the rental return of the lessee, and cause such return to be made in the name of the lessor.

For the reasons given, the judgment of the Court of Common Pleas is affirmed.

MATTHEWS, PJ, ROSS and HILDEBRANT, JJ, concur in Syllabus, Opinion and Judgment.